## PATRICK HAMMEL v. C. M. HILL LUMBER COMPANY.[1]

Nos. 27,828, 27,851.

September 19, 1930.

[1]Reported in 232 N. W. 40, 234 N. W. 674.

2

*Fryberger, Fulton & Boyle,* for plaintiff-appellant.
*Baldwin, Baldwin, Holmes & Mayall,* for defendant-appellant.

DIBELL, J.

Action by the plaintiff to recover royalty upon a mining lease. There were two causes of action. The defendant answered separately to each. The court sustained the plaintiff's demurrer to the answer to the first. It overruled his demurrer to the answer to the second. The defendant appeals from the order sustaining the plaintiff's demurrer to the first cause. The plaintiff appeals from the order overruling his demurrer to the defendant's answer to the second cause.

■ The first cause of action goes to the right of the defendant, under facts somewhat involved, to mine against advance royalties which accrued under an earlier sublease of the same land.

On January 16, 1911, the Thomas Feigh Land Company leased mining land in Crow Wing county to the defendant, C. M. Hill Lumber Company, under a mining lease running for 50 years at 35 cents a ton royalty. Thereafter the Thomas Feigh Land Company conveyed to the plaintiff 10.267 per cent of the fee. This gave the plaintiff $.0359375 royalty per ton on each ton of ore mined.

The lease did not require a minimum output, and there were no advance royalties. It provided that if it should be assigned by the lessee, the defendant, then there should be mined and removed from said land each year while the lease was in force a minimum of 40,000 tons of ore at 35 cents per ton and there should be the usual provision for advance royalties. The lease was not assigned.

The lease further provided that if the defendant should sublease the lands for mining purposes it should require by the terms of the sublease the mining and removal of a minimum output of not less than 25,000 tons annually and should provide that in case the sublessee did not remove such quantity there nevertheless would be paid royalty at the agreed rate, not to be less than 35 cents per ton, upon the minimum quantity agreed to be removed, and that payments in excess of minimum royalties for ore removed should be advance royalties. We quote a portion which the defendant regards important:

"If, or whenever, the party of the second part shall sublease said lands, or any part thereof, for mining purposes, it shall require by

the terms of any sublease the mining and removal from said lands of a minimum amount of ore each year, for the period of such sublease, to be therein specified, which shall be not less than twenty-five thousand (25,000) tons each year; and shall provide that in case such sublessee, or his assigns, shall not remove from said lands the quantity of iron ore so required by such sublease, the sublessee, or his assigns, shall nevertheless pay a royalty at the rate per ton agreed upon in said lease, which shall not be less than thirty-five cents (35¢) per ton, upon the minimum quantity so agreed to be removed, as aforesaid, of which amount so agreed to be paid there shall be paid to the party of the first part herein, an amount equal to thirty-five cents (35¢) per ton upon the minimum amount so agreed to be mined and removed by such sublease, the same to be paid in each year in four (4) equal installments on the quarter days aforesaid, up to the time, and until, such sublease shall expire, or be terminated in manner therein expressed. Provided, however, that payments made in any quarter in excess of the royalties on ore actually shipped during such quarter, shall be deemed advance royalties, on account of which in any subsequent quarter of the same, or of any subsequent year, during the continuance hereof, ore may be mined and shipped, after enough ore shall have been shipped, or paid for, during such year to cover so much of the minimum for such year as may be applicable to the quarter thereof then pending, and those already elapsed. The party of the second part herein shall pay, or cause to be paid, to the party of the first part all royalties to become due hereunder for iron ore removed from said land, and any sublessee hereunder shall pay direct to said Thomas Feigh Land Company all advance royalties payable to it, at the times and in the manner herein provided for; and if such sublessee shall fail to make payment of any of said advance royalties at the time and in the manner herein provided for, then the party of the second part herein shall at once cancel such sublease, or itself pay said advance royalties to said Thomas Feigh Land Company."

On October 8, 1914, the defendant subleased, in accordance with the terms of the underlying lease, to the Hill Consolidated Mines

Company. The sublease provided that the sublessee should pay the fee owners on the 20th days of January, April, July and October 35 cents per ton on a minimum output of 25,000 tons annually; and in substance that payments made in any quarterly period in excess of royalties on ore actually shipped during the quarter constituted advance royalty on account of which in any subsequent quarter of the same or subsequent year ore might be mined and shipped after payment of current and accrued minimums. This lease continued in force until June 22, 1925, when it was terminated upon notice in accordance with its provisions. At the time of the termination advance royalties had accrued; or, putting it otherwise, the sublessee at that time might have removed more ore than it had removed without payment of more royalty. It had overpaid with its minimums for ore actually taken and was entitled to mine against minimum royalties. The sublessee paid no more royalties, mined no more ore, the lease was at an end, and the sublessee was not further interested. There was no more mining until 1928, when it commenced under the underlying lease modified in 1926 as now to be mentioned.

On August 20, 1926, the plaintiff and the other fee owners agreed with the defendant upon a modification of the original lease of January 16, 1911. No reference was had to the sublease of October 8, 1914, to the Hill Consolidated Mines Company, nor was that company a party to the modification. The sublease was no more, and the sublessee asserted no rights and had none. The ones interested were the original lessors and the original lessee.

The modification agreement was worked out with much detail but mostly unimportant to the present controversy. The mining of ore was to commence January 1, 1927. It contained a provision which contemplated that the mine might be worked in connection with other properties operated by the lessee. It provided what should be done with waste material. It provided that nonmerchantable ore might be beneficiated and that royalties should accrue only on the concentrates. Iron ore was to be construed as including manganese. The weights of a weightometer might be taken in lieu

6

of railway scale weights. It provided with great circumstance how the operations should be conducted and inspection had and accounts kept and reports made. Specified provisions were worked out as to the payment of taxes. Paragraph 14, the part most important here, is as follows:

"Second party further agrees and covenants that there shall be mined and shipped from said lands described in said original lease dated the 16th day of January, 1911, and described in this modification, beginning with the first of January, 1927, not less than twenty-five thousand (25,000) gross tons of iron ore for each year thereafter; and in case second party shall not remove from said lands the quantity each year herein stipulated, it shall nevertheless pay by way of advance royalties upon twenty-five thousand (25,000) tons, as aforesaid, at thirty-five (35) cents per ton, the same to be paid in each year in four equal installments on the quarter days aforesaid, up to the time, and until, this lease shall expire or be terminated in manner herein expressed. Provided, however, that payments made in any quarter in excess of royalties on ore actually shipped during such quarter shall be deemed advance royalties, on account of which in any subsequent year, during the continuance hereof, ore may be mined and shipped without further payment therefor, after enough ore shall have been shipped or paid for during such year to cover so much of the minimum for such year as may be applicable to the quarter thereof then pending and those already elapsed, it being the express intention that the lessee is to pay the lessors the minimum royalties on twenty-five thousand (25,000) tons of ore at the rate of thirty-five (35) cents a ton each year, whether ore is mined or not, but this shall not prevent the lessee from mining in a subsequent year ore that is paid for by the minimum royalties in a preceding year."

The controversy is over the royalties for 1928. During that year there were mined, under the terms of the underlying lease, as modified in 1926, 67,439.33 tons. The defendant did not pay for it all but sought to mine against the advance royalties which had accrued on the sublease which was terminated in June, 1925. The trial court

held that it must pay royalty in money for the 1928 mining and that it had no advance royalty to use. In holding so it said:

"Under the original lease the defendant was under no obligation to pay advance royalties. If sublessee failed to pay the advance royalties, the defendant had the option of cancelling the sublease, or pay the royalties itself. Under the modification, the defendant obligates itself to pay advance royalties. It is the party liable. It has no option. In my opinion, paragraph 14 of the modification sets out new obligations and specifically modifies the clause in the original lease relative to advance royalties. Under the new agreement, wherein the defendant obligates itself to pay the advance royalties, it will receive no credit for royalties heretofore paid by a prior sublessee. As to advance royalties, paragraph 14 in the modification cleans the slate, and creates an entirely new arrangement."

The plaintiff as part fee owner was entitled as royalty to $.0359375 on each of said 11,176.5 tons for which the defendant did not pay, or a total of $365.72, for which payment was not made. The defendant claims to pay this by the application of the advance royalty accumulated at the time of the termination on June 22, 1925, of the sublease to the Hill Consolidated Mines Company, at which time it is conceded that the advance royalties equaled the royalties in default in 1928 under the modified lease.

We follow the result reached by the trial court without difficulty. After the sublease was terminated in June, 1925, the sublessee had no advance royalty against which he might mine. The lease was at an end and his rights are gone. There is a little confusing or uncertain language in the underlying lease in reference to subletting by the lessee, but we are at a loss to see any advance royalty against which anyone could mine after the definite termination of the lease in June, 1925. The modified agreement of 1926 evidences no thought of advance royalty except such as might come in the future. There was no thought of payment of rent or royalty except in cash, though thereafter, in the operation of the mine, there might accrue advance royalties against which the lessee in the future might mine. When mining commenced under the modified

lease the terms of that lease as to advance royalties were alone controlling.

The defendant complains that the plaintiff is, under the ruling of the court, getting paid for ore for which it has once been paid. This may be. It is true only in the sense that the sublessee might have mined more. The defendant did not pay. The sublessee paid. The right of the defendant to claim that it is made to suffer we do not see.

The defendant cites Hoffman v. Murphy, 44 Colo. 107, 96 P. 780; First Nat. Bank v. St. Anthony & D. Elev. Co. 171 Minn. 461, 214 N. W. 288. These two cases have been examined carefully but contain nothing so directly bearing upon the case at bar as to call for a discussion.

■ The plaintiff by his second cause of action seeks to recover the first instalment of the 1929 royalty under the modified lease amounting to $224.60. The action was commenced on April 15, 1929. The defendant claims the cause of action for it is premature, and the court so held and it was right.

The underlying lease provided for payments "on the 20th days of January, April, July and October in each and every year." The modified agreement does not change the time of payments though it does provide that mining shall commence on January 1, 1927. There is nothing to indicate that payments are to be made quarterly in advance. They are to be made 20 days after each quarter.

Orders affirmed.

### After Reargument.

On February 6, 1931, the following opinion was filed:

Dibell, J.

■ The petition of the defendant for reargument was granted. In granting it we suggested that it might aid the court if counsel discussed the effect of the cancelation of the sublease on June 22, 1925, upon the advance royalties and the right thereafter to mine against them. This question was not fully discussed at the first hearing; and we were subject to the just criticism of deciding the case upon a point not made the chief one on appeal.

The matter has been orally argued at length and fully reconsidered. We are convinced that we were right. We need not add to what was said in the first subdivision of the former opinion.

■ The trial court was of the opinion that paragraph 14 of the modification agreement affected the clause in the original lease relative to advance royalties; and that under the new agreement, wherein the defendant obligated itself to pay advance royalties, there was a new arrangement and that there could be no application of 1928 royalties against those accruing under the 1925 sublease; and, as it expressed it, paragraph 14 in the modification agreement "cleans the slate, and creates an entirely new arrangement."

Paragraph 14 is quoted in the former opinion. It is barely referred to there. Upon a thorough consideration we are of the view that the result reached may be placed well enough upon the ground suggested; that is, that when the modification agreement was made it was intended, so far as concerns the question important here, that the old arrangement was at an end and a new one begun, and that royalties of 1928 could not be applied against advance royalties under the terminated sublease.

Only one order is affected by the reargument, and it stands affirmed.

Order affirmed.

LORING, J. took no part.